IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CRYSTAL DAWN NISBET,

        Plaintiff,

v.                                    Case No.: 2:13-cv-33047

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

        Defendant.

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 16, 17). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 6). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    Procedural History

Plaintiff, Crystal Dawn Nisbet ("Claimant"), filed applications for DIB and SSI in late January 2011, alleging a disability onset date of July 9, 2009, (Tr. at 228, 230), due to

"Panic Disorder; Agoraphobia; OCD [obsessive compulsive disorder]; IBS [irritable bowel syndrome]; High Blood Pressure; Lower Back Pain; Herpes; Badly Fractured Ankle; Plantar Spurs; Bronchial Asthma; Hypertension; Bladder Problems." (Tr. at 271). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 18). Claimant filed a request for a hearing, which was held on August 22, 2012 before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 37-79). Prior to the hearing, Claimant amended her disability onset date to December 28, 2010, which was one day after a final decision denying prior applications filed by Claimant in 2009.

On August 30, 2012, the ALJ issued a written decision finding that Claimant was not disabled under the Social Security Act and was not entitled to benefits. (Tr. at 18-31). The ALJ's decision became the final decision of the Commissioner on October 23, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). On December 23, 2013, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on May 5, 2014. (ECF Nos. 11, 12). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 16, 17). Accordingly, this matter is ripe for disposition.

## II.   **Claimant's Background**

Claimant was 30 years old at the time she applied for benefits, as well as on the amended date of the alleged onset of disability. She was 32 years old at the time of the administrative hearing and on the date the ALJ issued his decision. (Tr. at 44). Claimant is a high school graduate, with an Associate's Degree from West Virginia Junior College in the field of legal assisting. (*Id.*). She communicates in English. (Tr. at 39). Claimant has

prior work experience as a legal assistant, a receptionist, a dancer, and a store manager, although her work as a legal assistant was quite limited. (Tr. at 42-43, 273).

### III.   <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step,

the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the

fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through September 30, 2013. (Tr. at 20, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since December 28, 2010, the amended alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of lumbar strain; status-post left ankle fracture; obsessive-compulsive disorder; and panic attacks. (Tr. at 21-22, Finding No. 3). However, Claimant's herpes simplex and acid reflux disease were considered non-severe impairments because they had not affected Claimant for at least twelve consecutive months, and her hypertension, asthma, ovarian cysts, bilateral carpal tunnel syndrome, plantar spur, and IBS were non-severe because they were well-controlled and produced no significant symptoms. (Tr. at 22). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal any of the listed impairments. (Tr. at 22-24, Finding No.

4). Therefore, the ALJ determined that Claimant had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds, frequently balance, stoop, kneel, occasionally crouch and crawl; should avoid concentrated exposure to extreme cold, vibration, fumes, odors, gases, dust, and poor ventilation, and hazards, such as moving machinery and unprotected heights; work must accommodate use of a cane; work involves simple, routine, repetitive tasks, no fast pace or strict production requirements, occasional decisionmaking, occasional changes in work setting, and occasional interaction with supervisors, co-workers, and the public.

(Tr. at 24-30, Finding No. 5). At the fourth step of the analysis, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 30, Finding No. 6). Consequently, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC under the fifth and final step to determine if she would be able to engage in substantial gainful activity. (Tr. at 30-31, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1980 and was defined as a younger individual; (2) she had a high school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's disability determination. (Tr. at 30, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 30-31, Finding No. 10). At the unskilled light level, Claimant could work as a mail room clerk, laundry worker, or kitchen worker; and at the sedentary level, Claimant could perform jobs such as a surveillance system monitor, product inspector, or hand packer. (Tr. at 31). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act. (*Id.*, Finding No. 11).

**IV.    <u>Claimant's Challenges to the Commissioner's Decision</u>**

Claimant argues that the Commissioner's decision is not supported by substantial evidence for two reasons. (ECF No. 16 at 5-9). First, Claimant contends that the ALJ improperly assessed her credibility, finding Claimant not to be credible despite her consistent, longstanding complaints and supporting objective medical findings. (*Id.* at 6-7). Second, Claimant asserts that the ALJ failed to accord proper weight to Claimant's treating source opinions. (*Id.* at 7-9). In particular, the ALJ undervalued the opinions of Mr. Hall, who cared for Claimant's psychological impairments, and Dr. Goudy, who performed a psychological evaluation of Claimant. According to Claimant, Mr. Hall and other treating sources opined that Claimant was not a good candidate for employment due to her panic attacks and obsessive compulsive ruminations. These opinions were consistent with the results of Dr. Goudy's evaluation. By disregarding all of the opinions, the ALJ failed to fully account for the limitations suffered by Claimant. As a consequence, the ALJ's RFC finding only partially accommodated the severe effects of Claimant's mental impairments. (Tr. at 9).

In response, the Commissioner maintains that the ALJ conducted a thoughtful and appropriate credibility analysis and found that Claimant's allegations of debilitating symptoms were not entirely credible given their inconsistency with the rest of the evidence. (ECF No. 17 at 6-8). Furthermore, the Commissioner argues that Claimant is mistaken when she claims that the ALJ did not properly assess and weigh the medical source opinions. (Id. at 8-11). Although the ALJ did not give controlling weight to the opinions of Claimant's treating providers, he provided reasonable explanations for discrediting the opinions, and he weighed the opinions of non-acceptable medical sources in keeping with Social Security regulations and rulings. Therefore, in the Commissioner's

view, the ALJ fully complied with applicable procedures and his decision is supported by substantial evidence.

## V.   **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety, including the treatment records in evidence. Nonetheless, the following summary of the medical evidence is limited to Claimant's psychological impairments, as those impairments are most relevant to the issues in dispute.

### A. Treatment Records

On October 25, 2010, Claimant presented to Process Strategies, a group specializing in psychological disorders, and saw Physician's Assistant ("PA") William Hall. (Tr. at 402-03). Claimant had fallen and broken her left femur and ankle and was now using a crutch and wearing an air cast and boot. She reported that she was sleeping well and had recently had a psychological evaluation for disability benefits. She displayed a generally euthymic mood, with minor counting/compulsive behavior and mild agoraphobia. (Tr. at 402). Her mental status examination revealed direct eye contact, good interaction, appropriate appearance, and appropriate affect. (Tr. at 403). She was not suicidal or homicidal and had no hallucinations, delusions, or abnormal thought content. Her cognitive functioning was at baseline. She listed family and financial issues as her stressors, but noted that her symptoms had improved with medication. (*Id.*). PA Hall diagnosed Claimant with Panic Disorder with Agoraphobia and OCD features (ego syntonic). (Tr. at 402). She was given supportive intervention and instructed to continue taking her medications and attending individual therapy with Paul Puglisi. (Tr. at 403).

Claimant saw PA Hall again on December 9, 2010. (Tr. at 400-01). She reported interdose anxiety with the use of Xanax, although no full panic attacks. Claimant

continued to display compulsive behavior, indicating that she did "everything in 3's." Claimant's mental status examination had not changed significantly from the prior visit, and she was noted to have symptom improvement with medication. (Tr. at 401). Her stressors were financial and medical issues. PA Hall instructed Claimant to continue taking Xanax and participating in individual therapy with Paul Puglisi. (*Id.*). Claimant's diagnoses of Panic Disorder with Agoraphobia and OCD features (ego syntonic) remained the same. (Tr. at 400).

On January 5, 2011, Claimant returned to Process Strategies for an appointment with PA Hall. (Tr. at 398-99). She described having low frequency, limited symptom panic attacks in the interim and continuation of minor compulsive behavior. Her stressors included parenting issues, financial/denial of her disability claim, and medical problems. (*Id.*). Otherwise, there were no changes in her mental status examination, instructions for care, or diagnoses. (*Id.*).

Claimant's next visit at Process Strategies with PA Hall was on March 2, 2011. (Tr. at 394-95). Claimant reported discontinuing Luvox after a single dose due to a sudden increase in anxiety. She also complained of having breakthrough, but limited symptom, panic attacks on Xanax. (Tr. at 394). She denied significant depression. Claimant's mental status examination revealed the usual normal findings, except her interpersonal behavior was "dependent," and her cognitive functioning was described as "alert" and "aware," rather than "baseline. (Tr. at 395). PA Hall eliminated the Luvox prescription from Claimant's regimen and replaced it with Vistaril. Her diagnoses remained the same. (Tr. at 394). PA Hall noted that Claimant was improved with medication, and he instructed her to continue taking her prescriptions and attending individual therapy. (Tr. at 395).

On March 30, 2011, Claimant told PA Hall that she had been coping better, although she had some parenting issues and significant marital problems. Her OCD was at baseline with no significant distress noted. Claimant's mental status examination reflected normal findings. (Tr. at 393). She was noted to be improved with medication. PA Hall instructed her to continue taking her prescriptions and participating in therapy. (*Id.*). Claimant's diagnoses remained the same. (Tr. at 392).

Claimant's follow-up appointments with PA Hall on May 4, 2011, June 6, 2011, and July 5, 2011 demonstrated relatively stable symptoms. (Tr. at 386-391). Her primary stressors were marital. She and her husband separated for one week, but once he returned home in late May, Claimant experienced a decrease in her anxiety level. (Tr. at 388). They continued to have problems in their marriage, largely involving parenting issues, but Claimant's mental status examinations were essentially baseline with the exception of her mood, which was described as anxious. (Tr. at 387, 389, 391). Claimant's diagnoses remained unchanged, her medication dosages were tweaked, and she was instructed to continue with individual therapy. (Tr. at 386-391).

On August 2, 2011, Claimant reported to PA Hall that she felt generally euthymic and had not experienced any full panic attacks, but she did have increased anxiety over the possibility of a separation or divorce from her husband. (Tr. at 384). Claimant was also stressed over the amount of time she was spending taking care of her father, who was seriously ill. Claimant's mental status examination showed a dependent interpersonal demeanor, with an anxious affect and mood. Her energy was documented as varying. Otherwise, the remainder of the examination was normal. (Tr. at 385). Apparently, Claimant had stopped individual therapy at some point, because PA Hall instructed her to resume therapy and continue taking her medications. (*Id.*). PA Hall amended Claimant's

diagnoses to add at Axis II the diagnosis of Dependent Personality Disorder. (Tr. at 384).

Claimant returned to Process Strategies on August 30, 2011 and saw PA Hall. (Tr. at 430-31). She reported that her father was in the hospital and near death. She obsessively worried, although Claimant conceded that her medications helped to reduce her symptoms of anxiety. (Tr. at 430). Claimant also stated that she was grieving the loss of her stepbrother, who had been shot and killed in the past month. Claimant's mental status examination was normal, except her mood was documented as anxious. She was told to continue with her medications and individual therapy. (Tr. at 431).

On September 27, 2011, Claimant told PA Hall that she was getting adequate sleep, felt euthymic, had no panic episodes, negligible OCD symptoms, and was generally coping well with her stressors. (Tr. at 428). She relayed having been able to attend the funeral of an elderly friend without becoming distraught. PA Hall performed a mental status examination, which was normal, and instructed Claimant to continue with her medications and individual therapy. (Tr. at 429).

Claimant had four additional visits with PA Hall in 2011, one in October, one in November, and two in December. (Tr. at 396-97, 422-27). In October, she reported that she was "coping better" with her stressors. (Tr. at 426). In November, Claimant felt euthymic and had no panic attacks to report. (Tr. at 424). She mentioned that her husband was on medical disability and her ten-year-old son had ADHD with conduct problems, but her mental status examination was normal. (Tr. at 424-25). On December 2, 2011, Claimant stated that she had experienced a severe panic attack two weeks prior when she had to take her son to the Emergency Department for chest pain. (Tr at 396). She also felt her husband was verbally abusive and unsupportive and she had compulsive behaviors; however, by December 20, 2011, Claimant was doing better, with a normal

mental status examination, no complaints of recent panic attacks, negligible OCD symptoms, and a generally euthymic mood. (Tr. at 422-23).

On January 17, 2012, Claimant presented to PA Hall with increased worry due to situational stressors, primarily related to her health. (Tr. at 450). Claimant had been diagnosed with endometriosis and ovarian cysts and had been scheduled for a gynecologic evaluation. She also had persistent foot pain. Claimant's mental status examination was essentially normal, although PA Hall documented that Claimant displayed facial gestures consistent with pain, and she had a slight limp. (Tr. at 451). Her diagnoses remained unchanged, and she was instructed to continue with medications and therapy. (Tr. at 450-51).

The last two visits in the records supplied by Process Strategies are dated March 13, 2012 and May 8, 2012. (Tr. at 452-55). At both visits, Claimant was diagnosed with Panic Disorder with Agoraphobia; OCD; and Dependent Personality Disorder. Her mental status examinations were normal. Claimant reported a euthymic mood, no panic attacks, negligible OCD symptoms, and an anxiety level within normal limits. (*Id.*) PA Hall instructed her to continue taking her medications and participating in individual therapy. At both visits, PA Hall documented that Claimant was improved with medication. (*Id.*).

### B. Evaluations and RFC Opinions

On February 17, 2011, Timothy Saar, Ph.D., completed a Psychiatric Review Technique based upon his review of the medical records, including records from Process Strategies. (Tr. at 342-55). Dr. Saar diagnosed Claimant with an anxiety-related disorder, which he deemed to be a non-severe impairment. (Tr. at 342, 347). Under paragraph B criteria, Dr. Saar found Claimant to have no limitations in her activities of daily living and

in maintaining social functioning; to have mild limitations in maintaining concentration, persistence, or pace; and to have suffered no episodes of extended decompensation. (Tr. at 452). He concluded that Claimant did not satisfy paragraph C criterion. (Tr. at 353). Dr. Saar pointed out that all of Claimant's findings were within normal limits or mildly abnormal, thus supporting his determination that her mental impairment was not severe. (Tr. at 354). After this evaluation, Dr. Saar was asked to review the December 27, 2010 administrative decision by ALJ Jerry Meade, in which the ALJ found that Claimant had the severe impairments of anxiety and OCD. (Tr. at 85). After considering the December 2010 decision, Dr. Saar completed a Case Analysis dated April 11, 2011, stating "I have reviewed the ALJ decision of 12/27/10, but controlling weight given to more recent treatment MER [medical evidence record]." (Tr. at 373). Accordingly, Dr. Saar maintained his opinion that Claimant's mental impairment was not severe.

On May 6, 2011, William Hall, PA, prepared a Medical Source Statement of Ability to Do Work-Related Activities (Mental) at the request of Claimant's counsel, which was countersigned by a physican. (Tr. at 379-81). PA Hall opined that Claimant had good ability to remember locations and work-like procedures; understand, remember, and carry out short, simple instructions; perform activities within a schedule, maintain regular attendance and be punctual; and make simple work-related decisions. He felt Claimant had a fair ability to understand, remember, and carry out detailed instructions; work with or near others without being distracted; complete a normal workday or workweek; and had a poor ability to work at a consistent pace. (Tr. at 379). He based these opinions on Claimant's history of panic attacks, which worsened in public and crowds, and her compulsive and avoidant behaviors. (Tr. at 380). PA Hall further opined that Claimant had an excellent ability to be aware of hazards and take precautions; and a

good ability to ask simple questions and ask for help, adhere to basic standards, and travel in unfamiliar places. However, he believed that Claimant had only a fair ability to accept instructions and respond appropriately to criticism, get along with others, be socially appropriate, respond to change properly, and make plans independently of others. (*Id.*) Her ability to interact with the public appropriately was poor. He based these opinions on the same reasons previously provided. PA Hall did believe that Claimant could manage any benefits that she received. (Tr. at 381).

On June 2, 2011, agency consultant, Rosemary L. Smith, Psy.D., completed a Case Analysis and Mental Residual Functional Capacity Assessment. (Tr. at 121-23, 125-27). Based upon her review of the Process Strategies records, Dr. Smith opined that Claimant's Anxiety Disorders were severe impairments. (Tr. at 122). However, Dr. Smith did not find Claimant's statements regarding the intensity, persistence, and functionally limiting effects of her psychological symptoms to be credible, because the statements were disproportionate to the evidence. (Tr. at 123). Dr. Smith also disagreed with portions of PA Hall's Medical Source Statement of Ability to Do Work-Related Activities (Mental), finding his ratings of "poor" to be too severe for the medical findings. Dr. Smith concluded that Claimant had psychological limitations in social functioning and concentration, persistence, and pace, but they were not disabling. (*Id.*).

As to specific limitations, Dr. Smith opined that Claimant was not significantly limited in the following activities: ability to remember procedures/locations; ability to understand, remember, carry out short and simple instructions; ability to sustain an ordinary routine without special supervision; ability to work with or near others without being distracted; ability to make simple work-related decisions; ability to ask simple questions or request assistance; ability to get along with co-workers and peers; and ability

to adhere to standards of neatness. She found Claimant to be moderately limited in the following activities: ability to understand, remember, and carry out detailed instructions; ability to maintain concentration and attention for extended periods; ability to meet a schedule and be punctual; ability to complete a normal workday and workweek and perform at a consistent pace; ability to interact with the general public; and the ability to accept instructions from supervisors and respond appropriately to criticism. (Tr. at 125-27). Dr. Smith summed up her opinions by stating that Claimant retained the ability to learn and perform simple, unskilled work-like activities in an environment that involved limited contact with others. (Tr. at 127).

On August 10, 2011, Paul Puglisi, M.A., and John Todd, Ph.D., psychologists at Process Strategies, wrote a letter outlining Claimant's diagnoses and explaining her participation in therapy. (Tr. at 383). They indicated that Claimant's primary diagnosis was OCD and her secondary diagnosis was Panic Disorder with Agoraphobia. They felt that these diagnoses hindered Claimant's functioning in many areas. According to the psychologists, Claimant felt compelled to complete tasks three times and imagined horrific events occurring to others if she failed to do so. She also had panic attacks, and her fear of them occurring in a public setting caused her to withdraw from public activities. (*Id.*). Due to her symptoms, the psychologists opined that Claimant was not "a good candidate for employment." However, they felt she was motivated in treatment and wanted to improve in order to return to work in the future. (*Id.*).

On December 22, 2011, Claimant underwent a psychological evaluation by Tony Goudy, Ph.D., at the request of Claimant's attorney. (Tr. at 432-36). Dr. Goudy indicated that he had originally examined Claimant in December 2010 to determine if her psychological condition adversely affected her ability to work and was now performing an

updated evaluation to see if there had been any changes in the interim. Claimant told Dr. Goudy that her main complaints were Panic Disorder with Agoraphobia and OCD. (Tr. at 432). She stated that she had frequent panic attacks, suffering two "major' attacks per week, with "little ones" occurring nearly every day. She isolated herself, leaving home only once each month, except to pick up her son from school and attend doctor's appointments. Claimant also indicated that her OCD compelled her to do everything in three's, and she even repeated her answers to questions three times during the interview. (Tr. at 433). Dr. Goudy documented the history of Claimant's psychological problems, commenting that her panic attacks started in her teenage years, and the OCD similarly had been present for many years. Claimant received regular medication management from PA Hall and individual counseling from Paul Puglisi, M.A., two times each month. She currently took only Vistaril for psychiatric issues. Claimant had never been hospitalized for a psychiatric illness, but did go to the Emergency Department one time in the 1990's during a panic attack. (*Id.*). Dr. Goudy also reviewed records in preparation for his evaluation; specifically, two mental RFC assessments prepared by PA Hall.

Dr. Goudy first performed a mental status examination. (Tr. at 434-35). He found Claimant to have good personal care and hygiene, with a nervous interpersonal attitude and mood. She was using crutches and limping heavily, and Dr. Goudy witnessed a fine motor tremor in both hands. (Tr. at 434). Her speech and communication were coherent and spontaneous, although she tended to go on nervous tangents and repeated thoughts three times. Claimant was oriented, and had no perceptual disturbances or suicidal ideations. Claimant's immediate and remote memory was intact, but her recent memory appeared moderately impaired. Her concentration was moderately impaired based on testing by serial threes. (*Id.*) Her intellectual functioning was estimated to be low average,

and her judgment was considered consistent with her intellect. (Tr. at 435). Dr. Goudy next administered the Beck Anxiety Index to Claimant, whose score indicated severe anxiety. Accordingly, Dr. Goudy diagnosed Claimant with Panic Disorder with Agoraphobia and OCD. (*Id.*). He gave her a Global Assessment of Functioning Score of 50-55.[1]

In conclusion, Dr. Goudy opined that Claimant's diagnoses were consistent with the records and with his prior evaluation. He felt that she should be assessed for disability purposes under Listing 12.06, specifically paragraphs A.3 and A.4, and he believed that she met the Listing. Under the paragraph B criteria, Dr. Goudy opined that Claimant had mild impairment in performing activities of daily living, marked impairment in social functioning and concentration, persistence, and pace, and had no episodes of decompensation. (Tr. at 436). In addition, he attached a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which he opined that Claimant had a poor ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; sustain an ordinary routine without supervision; work with or near others without distraction; complete a normal workday or workweek; and interact appropriately with the public. (Tr. at 437-38). He opined that Claimant had a fair ability to understand, remember, and carry out simple instructions, make simple work-related decisions, accept

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

criticism and instructions; behave in a socially appropriate manner; and travel in unfamiliar places; while she had a good ability to remember procedures; perform at a consistent pace; ask simple questions; get along with co-workers; adhere to standards of neatness; respond appropriately to changes in the work setting; be aware of hazards and take precautions; and make plans independently of others. (*Id.*)

On June 8, 2012, PA Hall completed an updated Medical Source Statement of Ability to do Work-Related Activities (Mental), which was countersigned by a physician. (Tr. at 457-59). His ratings were nearly the same as those provided in May 2011, except PA Hall opined that Claimant's ability to perform at a consistent pace was "fair" now rather than "poor;" her ability to interact with the public had improved from poor to fair, and her ability to maintain socially appropriate behavior had improved from fair to good. (*Id.*) His explanation for the ratings was the same one provided in 2011; that being, that Claimant's intermittent panic episodes with worsening in crowds caused her to be withdrawn, and her compulsive behavior made her inefficient. (Tr. at 458).

## VI.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court

will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   <u>Discussion</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence on the grounds that the ALJ (1) incorrectly assessed Claimant's credibility, and (2) failed to accord proper weight to Claimant's treating source and evaluating source opinions. Each challenge will be addressed in turn.

### *A. Determination of Claimant's Credibility*

Claimant contends that the ALJ improperly assessed her credibility by disregarding significant portions of the evidence that bolstered her statements. Specifically, Claimant emphasizes that she consistently complained of anxiety and compulsive behaviors over a period of many years, and the treatment notes supplied by several different treating sources substantiated the persistence of her symptoms. However, in Claimant's view, the ALJ chose not to acknowledge the correlation between the medical records and Claimant's allegations.

Contrary to Claimant's assertion that the ALJ ignored evidence demonstrating the longstanding nature of Claimant's anxiety disorders, the ALJ fully accepted that Claimant's Panic Disorder with Agoraphobia and OCD were severe impairments that could reasonably be expected to cause all of the symptoms that she alleged. (Tr. at 25). Thus, the ALJ had no quarrel with the nature of Claimant's symptoms, or her contention that she suffered from the symptoms. Instead, the ALJ simply did not believe that Claimant experienced the symptoms with the frequency that she alleged, or to the extent that the symptoms were disabling.

Pursuant to Social Security regulations and rulings, the ALJ evaluates the credibility of a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the alleged symptoms. *Id.* §§ 404.1529(a), 416.929(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from

performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Chather*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5.

     In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical

evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the ALJ. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the

credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided a detailed overview of the medical evidence and consultative evaluations, throughout which he compared and contrasted Claimant's testimony, and then provided a logical basis for discounting the credibility of Claimant's statements regarding the severity of her symptoms. (Tr. at 24-30). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms she alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Tr. at 25). The ALJ provided multiple examples of instances in the record that made him question the reliability of Claimant's statements. First, the ALJ noted that Claimant alleged carpal tunnel syndrome as a severe impairment. However, when her treating physician suggested that she be tested with EMG and nerve conduction studies to confirm the diagnosis, Claimant never followed through with the testing. (Tr. at 26). Moreover, examinations reflected that she had a normal grip, normal fine manipulation, and no sensory or motor deficits.

Second, Claimant provided extremely inconsistent reports regarding the frequency and intensity of panic attacks. Claimant told PA Hall on many occasions that she had no panic attacks, or only limited episodes. The only severe panic attack she reported to PA Hall occurred in mid-November 2011 when she had to take her son to the Emergency Department with chest pain. (Tr. at 26). In contrast, on December 22, 2011, she told Dr. Goudy that she had two "major panic attacks per week" and little ones nearly every day. Claimant also exaggerated the number of panic attacks she experienced when she filled out a Disability Report filed with the SSA. (*Id.*)

Third, the ALJ pointed out that Claimant's treatment records from Process

Strategies did not corroborate her claims of disabling symptoms. (Tr. at 26). Instead, the records showed that Claimant improved with medication. The ALJ also noted that Claimant was not always compliant with medical treatment, which he found to be behavior that was inconsistent with the presence of disabling symptoms. (*Id.*). In particular, the ALJ mentioned Dr. Surface's documentation indicating Claimant's lack of compliance. Furthermore, the ALJ felt gaps in Claimant's treatment with Dr. Surface, her orthopedic surgeon, reflected poorly on her credibility. According to the ALJ, Claimant had relatively infrequent trips to the doctor for the allegedly disabling fracture of her ankle. The ALJ added that although Dr. Surface's records showed satisfactory healing of the ankle as early as one month after the fracture, Claimant continued to complain nine months later that her ankle had not healed. (Tr. at 26-27). Claimant also used a cane to walk even though she did not need one. She used the cane and made the complaints despite records that demonstrated her ability to walk without an assistive device and that showed her gait was intact. Again, the ALJ felt these discrepancies reflected poorly on Claimant's credibility.

Finally, the ALJ discussed Claimant's allegation, made on a Disability Report completed in June 2011, that she had frequent migraine headaches. (Tr. at 27). At the administrative hearing, Claimant similarly testified that since 2010 she had headaches three or four times a week. In stark contrast to that testimony, on a Personal Pain Questionnaire she completed in February 2011, Claimant made no mention of headaches. On March 23, 2011, Claimant again made no mention of headaches to Dr. Bhirud, who performed a comprehensive physical examination and evaluation of Claimant for the purpose of her disability applications. Claimant likewise failed to mention headaches in other forms, although she occasionally reported them, but certainly not with the

frequency she claimed at the hearing. In essence, the ALJ did not find Claimant to be a reliable historian or credible witness.

Having thoroughly reviewed the record and the ALJ's written decision, it is clear that the ALJ conducted a thorough examination of the relevant evidence, performed the two-step analysis required by the regulations and rulings, made a reasonable credibility determination based upon the record as a whole, and then provided a logical explanation for discounting the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms, which was supported by references to the specific evidence that informed the determination. Therefore, the Court finds that the ALJ fully complied with his obligations and made a credibility finding that is supported by substantial evidence.

### B. Weight Accorded to Medical Source Opinions

Claimant next argues that the ALJ failed to properly weigh the opinions of Claimant's treating sources at Process Strategies, including PA Hall, Mr. Puglisi, and Dr. Todd, as well as the opinion of Dr. Goudy, the consultant hired by Claimant's attorney. Claimant argues that the ALJ erroneously discounted all of these opinions even though the treating source opinions were entitled to controlling weight under the Social Security regulations, and all four opinions were consistent with each other and the rest of the evidence.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receive[s]." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's]

impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). In the context of determining an individual's RFC, the ALJ must always consider and address medical source opinions, and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7.

In general, the ALJ will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[2] listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to

---

[2] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence.[3] *Hays*, 907 F.2d at 1456.

The ALJ may also use evidence from other sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at *2; *see also* 20 C.F.R. § 416.913(d). SSR 06-03P sets forth the SSA's policy on how opinion evidence from medical sources that are not acceptable sources and non-medical sources should be considered on the issue of disability. The Ruling makes a distinction between types of "other sources," noting that there are health care providers, who are not acceptable medical sources, but treat the claimant's medical conditions, and there are non-medical sources, like teachers and rehabilitation counselors, who spend substantial time with the claimant in a professional capacity. As the Ruling explains, both types of sources may provide relevant evidence and have useful opinions:

---

[3] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). This Court has held that "while the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

> "Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time . . .

2006 WL 2329939, at *3. The Ruling additionally provides guidance on how the opinions of these other sources should be weighed, stating that the ALJ should consider the same factors that apply to the opinions of "acceptable medical sources," including: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. SSR 06-03P, 2006 WL 2329939, at *4. Not every factor applies in every case, and "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

Furthermore, the Ruling discusses how the ALJ should address other source opinions in the written decision, indicating that "the case record should reflect the **consideration** of opinions from medical sources who are not 'acceptable medical

sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." *Id.* at *6 (emphasis added). However, the Ruling acknowledges that "there is a distinction between what an adjudicator generally must consider and what the adjudicator must explain in the disability determination." *Id.* In general, an ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, *when such opinions may have an effect on the outcome of the case.*" *Id.* at *6 (emphasis added). The Ruling requires the ALJ to apply a common sense standard. For example, in an atypical case, when an "other source" opinion is given more weight than a "treating physician" opinion, and the decision is not fully favorable to the claimant, the ALJ **must** explain the reasons for the weight given to the two opinions. *Id.* On the other hand, the Ruling implicitly allows the ALJ leeway not to discuss an opinion from an "other source" that is duplicative or cumulative of opinions already addressed in the decision, that is tangential to the outcome, or that is integrated or adopted in another opinion explicitly weighed by the ALJ. *See, e.g., Love-Moore v. Colvin,* No. 7:12–CV–104–D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (holding that "the language in SSR 06–03p regarding what must be spelled out in the ALJ's opinion is more precatory than mandatory.") This interpretation of the Ruling is consistent with the general principle that although the ALJ is required to consider all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to discuss all evidence in the record." *Aytch v. Astrue,* 686 F.Supp. 2d 590, 602 (E.D.N.C. 2010); *see also Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical

observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, No. 2:08-CV-20, 2009 WL 2135081, at \*4 (E.D.N.C. July 15, 2009).

Medical source opinions on issues reserved to the Commissioner are treated differently than other medical source opinions; they are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."[4] SSR 96-5p, 1996 WL 374183 \*2. However, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.*

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d).[5]

*Id.* at \*3.

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d

---

[4] Examples of issues reserved to the Commissioner include "(1) whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; (2) what an individual's RFC is; (3) whether an individual's RFC prevents him or her from doing past relevant work; (4) how the vocational factors of age, education, and work experience apply; and (5) whether an individual [is unable to work or] is 'disabled' under the Social Security Act." SSR 96-5p, 1996 WL 374183 \*2.

[5] The applicable factors are now found at 20 C.F.R. §§ 404.1527(c), 419.927(c).

300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d. 700, 705 (3rd Cir. 1981)). As stated earlier, it is the ALJ's responsibility to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays*, 907 F.2d at 1456, and provide good reasons in the written decision for the weight given to the opinions. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

Here, the ALJ provided well-reasoned explanations as to the weight he gave to each medical source and other source opinion. (Tr. at 27-29). In regard to Mr. Puglisi and Dr. Todd, the ALJ acknowledged their joint opinions set forth in the August 10, 2011 letter. (Tr. at 28). However, the ALJ gave little weight to the opinions, especially the opinion that Claimant was not "a good candidate for employment," because the treatment notes from Process Strategies did not support such extreme limitations. (Tr. at 28). The ALJ stressed that on many occasions the Process Strategies notes reflected Claimant's mood to be euthymic, her eye contact direct, and her affect appropriate, all findings which contradicted the severe limitations suggested by Mr. Puglisi and Dr. Todd. The ALJ's assessment of the Process Strategies notes is accurate, and as these are the only notes reflecting Claimant's psychological treatment, the ALJ correctly used them to gauge the consistency and supportability of the opinions issued by Mr. Puglisi and Dr. Todd. The treatment records uniformly reflect normal or baseline findings in Claimant's mental status examinations, with just a few exceptions. (Tr. at 385,387, 389, 391, 393, 395, 397, 399, 401, 403, 451, 453, 455). Claimant rarely complained of full-fledged panic attacks,

regularly reported symptom relief with medication, and was frequently euthymic. She communicated well, with coherent thought processes and normal cognitive functioning. Many times, Claimant's interpersonal demeanor was described as "interacts well." Her anxiety was primarily situational, related to marital, financial, and parenting problems, rather than a more generalized and less focused apprehension. (Tr. at 384-403, 450-55). Whether Mr. Puglisi observed more serious symptoms during his counseling sessions is unknown, but certainly the records in evidence do not appear to corroborate the level of severity expressed by Mr. Puglisi and Dr. Todd in their August 2011 letter. Thus, even assuming that their opinions qualified as "treating source" opinions presumably entitled to greater significance, the ALJ acted within his authority to deny them controlling weight on the basis that they were not supported by the clinical records and were inconsistent with other substantial evidence. Accordingly, the ALJ proceeded to weigh all of the opinions, explaining the reasons for the weight afforded to each one.

Next the ALJ examined the RFC opinions of PA Hall, which were countersigned by Dr. Marilou Pataling Tynor. The ALJ gave no weight to these opinions on the basis that the findings of marked and moderate limitations in certain functional areas were contradicted by the treaters' own office notes. (Tr. at 29). For instance, the ALJ pointed to Claimant's documented lack of panic attacks, her euthymic mood, and her overall consistent improvement with medication. According to the ALJ, the notes verified that Claimant suffered only minor mental health symptoms. Indeed, several entries even labeled Claimant's symptoms as "mild," "minor," or "negligible." In October 2010, the record stated that Claimant had minor counting/compulsive behavior and was mildly agoraphobic. (Tr. at 29). In December 2010, the clinical note indicated that Claimant had no full panic attacks and her mood was euthymic. On August 2, 2011, Claimant again

reported no full panic attacks and improvement with medication. On August 30, 2011, Claimant was found to have decreased anxiety. In September 2011, her OCD symptoms were described as "negligible," and she reported that she was coping well with stressors. In November 2011, Claimant's mood was euthymic and she had no complaints of panic attacks. On March 13, 2012, Claimant's eye contact was direct, her affect appropriate, mood euthymic, and stream of thought was normal. Once again, the ALJ's reading of the records from Process Strategies is accurate. The clinical notes simply do not exhibit the level of impairment expressed in the RFC statements. This disconnect consequently provides a valid reason for the ALJ to reject the RFC statements.

Finally, the ALJ discussed the evaluation performed by Dr. Goudy, which the ALJ likewise found unreliable. (Tr. at 29). The ALJ gave Dr. Goudy's opinions no weight because (1) he performed a one-time evaluation at the request of Claimant's attorney; and (2) his opinions were chiefly based on the reports of Claimant, who was not credible. (Tr. at 29). A review of Dr. Goudy's evaluation substantiates the ALJ's concerns. To begin with, Claimant reported to Dr. Goudy that she had two "major" panic attacks each week, and had "little ones" nearly every day. (Tr. at 432). This history was so exaggerated that it inevitably undermined the validity of Dr. Goudy's subsequent opinions. According to the record, just two days before Claimant saw Dr. Goudy, she had an appointment with PA Hall. (Tr. at 422). At that visit, Claimant's mood was noted to be euthymic. Her OCD symptoms were documented as negligible, and Claimant reported no full panic episodes since her last visit a month earlier. Her mental status examination was completely normal, and she was considered to be "improved with medication." (Tr. at 423). In fact, the only time between October 25, 2010 and December 22, 2011 that Claimant reported having a "major" panic attack was at her December 2, 2011 visit. (Tr. at 396). On that

visit, Claimant stated that she had a severe panic attack in mid-November when she took her son to the Emergency Department with complaints of chest pain.  However, prior to that visit and after that visit, if Claimant reported any symptoms of panic attacks, they were described as mild or limited, and on many visits, she had none to report.

The ALJ also emphasized that Dr. Goudy was retained by Claimant's attorney. While the source of the referral should not, by itself, preclude the ALJ from giving credence to Dr. Goudy's opinions, "an ALJ may consider the manner in which a medical opinion is obtained as a factor in determining the weight to give that opinion." *Nolan v. Colvin*, No. 4:13–CV–00016, 2014 WL 2618571, at *9 (W.D.Va., Jun. 12, 2014) (citing *Sims v. Colvin,* No. 6:12–cv–3332–DCN, 2014 WL 793065, at *13 (D.S.C. Feb. 24, 2014)). Notably, Dr. Goudy was not supplied with updated treatment records to review as part of his assessment of Claimant. Instead, he was given only two mental RFC statements prepared by PA Hall. (Tr. at 433). As was previously discussed, the ALJ found PA Hall's RFC statements to be unreliable because they contained limitations far more severe than could be explained by the mild symptoms documented in the treatment records. Accordingly, Dr. Goudy was provided with both a history of the present illness and a limited set of records that skewed the picture of Claimant's symptoms.[6]

The ALJ fully considered the opinions of all of the medical sources in this case, weighed them based upon the factors set forth in the regulations, and explained the reasons for the weight given to each opinion. He disregarded or discounted not only the RFC opinions of PA Hall and Dr. Goudy, but also the opinion of an agency consultant, Dr.

[6] As the ALJ points out, Dr. Goudy was forced to rely almost entirely on Claimant's report of her symptoms as the basis for his opinions. Thus, her credibility was paramount in weighing the reliability of Dr. Goudy's assessment. In that vein, while not explicitly discussed by the ALJ in his written decision, it bears mention that Claimant's diagnosis of OCD rested in part on her self-described compulsive behaviors, such as doing everything in three's, and Dr. Goudy commented that Claimant even "tended to state things three times" during his evaluation of her. (Tr. at 434). Therefore, it is noteworthy that this compulsive behavior was conspicuously absent during Claimant's testimony at the administrative hearing.

Timothy Saar, who felt that Claimant's mental impairments were non-severe. Ultimately, the ALJ gave significant weight to the opinion of agency consultant, Dr. Rosemary Smith, who completed both a Case Analysis and a Mental RFC Assessment. (Tr. at 28). The ALJ explained that Dr. Smith's opinions were entitled to greater weight than the other opinions for the simple reason that her opinions were consistent with the treatment records and other evidence. Dr. Smith found Claimant to have severe anxiety-related disorders, and determined that Claimant had moderate limitations in five areas of work functioning, but retained the ability to learn and perform simple, unskilled work-like activities in an environment that involved limited contact with others. (*Id.*). The ALJ incorporated these limitations into Claimant's RFC finding, as well as additional limitations related to pace and production requirements, with only occasional changes in work setting, and only occasional decision-making duties. Thus, the functional effects of Claimant's mental impairments were fully accounted for in the RFC finding and in the hypothetical questions posed to the vocational expert.

Therefore, the Court finds that the ALJ followed the appropriate process in weighing the medical source opinions, including the treating source and other source opinions. The Court further finds that the ALJ's final assessments were supported by substantial evidence in the record, and he adequately accounted for Claimant's functional limitations in her RFC finding.

## VIII.  Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  March 2, 2015.

Cheryl A. Eifert
United States Magistrate Judge